**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

JOHN COOK,

      Plaintiff,                  CASE NO. 07-CV-13507

v.                           DISTRICT JUDGE THOMAS LUDINGTON
                                 MAGISTRATE JUDGE CHARLES BINDER

KELLY SERVICES, INC.,
and MAGLINE, INC.,

      Defendants.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
(Doc. 22, 23)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' motions be

**GRANTED** and the case be dismissed with prejudice.

## II.    REPORT

### A.    Introduction

By order of United States District Judge Thomas Ludington, this employment case alleging

disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

*et seq*., and the Michigan Persons with Disabilities Civil Rights Act ("MPWDCRA"), MICH.

COMP. LAWS § 37.1101 *et seq*., was referred to the undersigned magistrate judge on January 9,

2009, for a Report and Recommendation on Defendants' motions for summary judgment. (Doc.

25.)  A response to both motions was filed by Plaintiff on February 4, 2009.  (Doc. 27.)  Oral

argument was held on February 27, 2009. Therefore, the motions are ready for Report and Recommendation.

**B.    Background Facts**

The facts are largely undisputed. Plaintiff was diagnosed as learning disabled in second or third grade. (Pl.'s Resp., Doc. 27 at 9.) In September 2005, Plaintiff submitted an application to Kelly Services, Inc., ("Kelly") expressing interest in a work assignment at Defendant Magline, Inc. ("Magline"). (Def. Magline's Mot., Doc. 22 at 10.) Magline produces a "wide variety of products based on customer orders . . . [encompassing] approximately 27 major product groups, including various types of automated and manual hand-trucks, dollies, and ramps . . . . There are approximately 4,200 different make parts reflected in Magline's computer system that may be manufactured at the Standish facility." (Mosher Aff., Doc. 30, Ex. 3 ¶ 2.) A significant percentage of the operations require the use of measuring tools and mathematical skills and production work involves reading and understanding work orders and specifications. (*Id.* ¶ 4.) Magline generally employs a small staff, currently twelve regular production employees, and uses temporary workers during periods of high production. (*Id.* ¶ 5.)

Plaintiff applied for work at Magline through Kelly. Plaintiff submitted an employment application at the Kelly office that he and his wife completed together. (Pl.'s Dep., Doc. 23, Ex. 3 at 213-14.) Magline required temporary employees to complete a Work Order Analysis test due to the variety of production work these employees may be asked to perform. (Doc. 22 at 10.) Plaintiff completed the test, but the Kelly employee who checked it over found a number of incorrect answers. (Doc. 23 at 5.) Plaintiff's wife then informed the Kelly employee that Plaintiff has "dyslexia and dyscalculia" and that he would need assistance reading the questions. (Doc. 22 at 10-11.) The Kelly employee, Dee Ann Hellus, gave "Plaintiff permission to have his wife 'read

the test' to him." (Doc. 22 at 11, Pl.'s Dep. at 50.)  As Plaintiff concedes, his wife did not simply read the test questions to him but rather drew diagrams to help him, completed math problems, calculated correct measurements in answer to some of the questions and changed his incorrect answers to correct ones.  (Doc. 22 at 11; Doc. 23 at 6, Pl.'s Dep. at 52-59.)  When Plaintiff turned the test in, he did not inform Kelly personnel that his wife helped him answer questions on the test. (Doc. 23 at 6.)

Kelly assigned Plaintiff to work at Magline on October 3, 2005.  (Doc. 22 at 11.)  Plaintiff performed successfully and was referred to as a "keeper" by his supervisor, Scott Dankert, who encouraged Plaintiff to apply for permanent employment.  (Doc. 27 at 9-10.)  There are approximately 110 different work stations at Magline and Plaintiff worked in, at most, 22 of the stations.  (Doc. 30, Ex. 3 ¶¶ 3, 9.)

Magline's policy is to terminate temporary employees before they approach 1,000 hours of employment because if they pass the 1,000-hour mark they automatically become part of the bargaining unit of the union.  (Trombley Aff., Doc. 30, Ex. 2 ¶ 4.)  Plaintiff had worked for Magline for 922 hours on March 3, 2006, when he was notified that his temporary employment with Magline was terminated.  (Doc. 27 at 17.)

In December 2005 and February 2006, Plaintiff applied for permanent employment at Magline.  (Doc. 23 at 6.)  One of the questions on the employment application asked the applicant to check a box if he or she had any disability; Plaintiff did not check a box.  (*Id.* at 7.)  In February 2006, Plaintiff took a test given to those applying for permanent employment that was similar to the one he took for temporary employment.  (*Id.*)  Plaintiff did not ask for any accommodation. (*Id.*)  Magline administered this test and allowed test takers to revise incorrect answers within the hour provided for the test.  (*Id.*)

Magline employee Julie Trombley looked over Plaintiff's completed test, identified incorrect answers and allowed Plaintiff to try to correct them; however, after the hour was over, Plaintiff still had not answered the questions correctly. (*Id.*) Plaintiff then told Ms. Trombley that he had difficulties with reading and math. (*Id.*) Ms. Trombley asked Plaintiff how he was able to pass the test the first time and Plaintiff informed her that his wife helped him. (*Id.* at 8.) Plaintiff was not hired for the permanent position. Plaintiff contends that the position was "immediately filled by a temporary employee, and that a permanent employee was hired in June, 2006." (Doc. 27 at 33, 36.) Magline maintains that the position was never filled but was "placed on hold" and a separate position was created in late June 2006. (Doc. 22 at 14.)

Magline employee Kari Paige called Plaintiff in May 2006 and offered him a single 30-hour assignment at $8.50 per hour, which Plaintiff refused. (Doc. 27 at 17.) Plaintiff contends that this call does not alter the fact that Plaintiff suffered two adverse employment actions, i.e., being terminated from his temporary position and not being hired for the permanent position. (*Id.*)

During the period he worked at Magline, Plaintiff did not inform Magline that he had a disability nor did he ever seek an accommodation to perform his work assignments. (Doc. 22 at 11, Doc. 23 at 6.) In addition, Kelly never informed Magline that Plaintiff had any disability. (Doc. 22 at 11.) Kelly states that it was never asked to provide an accommodation to Plaintiff, other than to have Plaintiff's wife read the first test to him, and further notes that Plaintiff never asked Kelly to assist him in seeking an accommodation from Magline. (Doc. 23 at 8.)

Plaintiff's amended complaint (Doc. 19) alleges the following claims: (Count I) violation of the ADA based on Plaintiff's determinable disability of dyslexia and Defendants' "fail[ure] to properly accommodate Plaintiff's disability"; (Count II) violation of the ADA based on Plaintiff being regarded as disabled and Defendants' "fail[ure] to accommodate plaintiff"; (Count III)

violation of the Michigan PWDCRA based on Plaintiff's known disability and failure to accommodate; and (Count IV) violation of the Michigan PWDCRA based on Plaintiff being regarded as disabled and failure to accommodate. Plaintiff has not alleged that the tests given at the request of Magline were discriminatory.

### C.     Summary Judgment Standard

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine

whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406. "Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587 (6th Cir. 2008) (granting summary judgment where plaintiff supported each allegation of racial animus only with citation to his own testimony stating his opinion that he was the victim of racial harassment).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### D.    Analysis & Conclusion

An implicit threshold question before embarking on the examination of direct evidence or the prima facie showing required under the *McDonnell Douglas* framework is whether the employer knew of Plaintiff's protected status:

> A plaintiff is required to present prima facie evidence that the discharge "occurred under circumstances giving rise to an inference of discrimination." *Roge v. NYP Holdings*, 257 F.3d 164, 168 (2d Cir. 2001). In the vast majority of discrimination cases, an employer's knowledge of protected status can be assumed based on personal contact between the parties or review of the employee's personnel record. Employer knowledge of the protected status is therefore rarely discussed as an

6

element of the discrimination claim. The rarity with which this issue arises, however, should not mask the critical role that knowledge plays in raising an inference of discrimination. It is difficult to conceive of a situation in which it would be appropriate to infer intentional discrimination by an employer who was unaware that an employee belonged to a protected class. As the Third Circuit observed, "it is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant, and in this situation the bare *McDonnell Douglas* presumption no longer makes sense." *Geraci v. Moody-Tottrup Int'l*, 82 F.3d 578, 581 (3d Cir. 1996).

*Woodman v. WWOR-TV, Inc.*, 293 F. Supp. 2d 381, 386 (S.D.N.Y. 2003) (citing *Preblich-Holland v. Gaylord Enter. Co.*, 297 F.3d 438, 444 (6th Cir. 2002)).

In this case, Plaintiff contends that Kelly was on notice of Plaintiff's disability because he asked Kelly if his wife could read the test questions to him and Plaintiff attributes this knowledge to Magline via a joint employer theory. (Doc. 27 at 18.) Defendant Magline argues that it had no notice of Plaintiff's disability because neither Plaintiff nor Kelly informed Magline that Plaintiff had a disability nor did Plaintiff ever seek an accommodation to perform any of his work assignments. (Doc. 22 at 11; Doc. 23 at 6.)

"An employer has notice of the employee's disability when the employee tells the employer that he is disabled." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998). In addition, there is some authority that "[a] person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination." *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F. Supp. 641, 657 (D.D.C. 1997).

I suggest that Plaintiff's request to have his wife read the test questions to him is insufficient notice to either Kelly or Magline that Plaintiff had a disability and was seeking an accommodation for that disability. *See Peck v. Oakland Co.*, No. 07-10167, 2008 WL 450471, at *11 (E.D. Mich. Feb. 15, 2008) (where plaintiff mentioned that she was missing work because she had a MRSA infection, "[t]his Court does not believe that [p]laintiff's actions were sufficient to put [d]efendants on notice that she was requesting an accommodation for her alleged disability. Consequently, because [p]laintiff is unable to establish that she engaged in any activity protected by the ADA or PWDCRA, she cannot establish a prima facie case of disability retaliation."); *Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("Knowing that an employee has health problems . . . is not the same as knowing that the employee suffers from a disability."). Accordingly, I suggest that Defendants' motions for summary judgment be granted and the case be dismissed with prejudice.

### E.    Alternative Analysis

### 1.    Notice or Knowledge

Assuming, *arguendo*, that Plaintiff's request to have his wife read the test to him did provide notice to Kelly of his alleged disability, Plaintiff then attempts to impute Kelly's knowledge to Magline via a joint employer or agency theory.  (Doc. 27 at 17-22.)  The Sixth Circuit has recognized both of the theories advanced by Plaintiff as well as a single employer or integrated enterprise theory that applies when the defendant companies are related entities, such as parent and subsidiary.  *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997).  The Sixth Circuit noted that its decisions have not always clearly distinguished between the single and joint employer theories.  *Id.* at n.4.  I further note that Plaintiff's response

brief likewise appears to simultaneously argue aspects of both the single and joint employer theories.  (Doc. 27 at 19-20.)

### a.  Single Employer Theory

Plaintiff has not submitted any evidence that Defendants Magline and Kelly are related entities – such as parent and subsidiary – and therefore I suggest that the single employer theory has not been advanced.

### b.  Joint Employer Theory

The joint employer theory may be considered in this case because it applies where "the business entities involved are in fact separate but . . . they share or co-determine those matters governing the essential terms and conditions of employment." *Swallows*, 128 F.3d at 993.  "The basis of the joint employer finding is simply that one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* (citations omitted).  Thus, "[w]hile the single employer test looks at the overall relationships of the two entities, joint employer status is determined by focusing on the entities' relationships to a given employee or class of employees." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1324 (10th Cir. 2004).

"Factors to consider include 'authority to hire, fire and discipline employees, promulgation of work rules and conditions of employment, issuance of work assignments and instructions, and supervision of employees' day-to-day activities.'"  *Russell v. Bronson Heating and Cooling*, 345 F. Supp. 2d 761, 771 (E.D. Mich. 2004) (quoting *EEOC v. Regency Windsor Mgmt. Co.*, 862 F. Supp. 189, 191 (W.D. Mich. 1994)).  "Numerous courts have considered the key to joint employment to be the right to hire, supervise, and fire employees." *EEOC v. Pacific Maritime*

*Ass'n*, 351 F.3d 1270, 1277 (9th Cir. 2003) (finding summary judgment in favor of defendant should have been granted where association of stevedoring companies assigned worker to company but did not have the right to hire or fire the employee).

In this context, I note at the outset that Plaintiff's reliance on *Grace v. USCAR*, 521 F.3d 655 (6th Cir. 2008), to support his argument that Magline and Kelly are joint employers appears to be misplaced. Defendant contends that *Grace* is not applicable because it involved claims under the Family and Medical Leave Act ("FMLA"). In *Grace,* the Sixth Circuit simply assumed, for purposes of argument, that both defendants were employers under Title VII and that Bartech had sufficient notice of USCAR's alleged discrimination. *Id.* at 677. As noted by the district court, joint employment under Title VII, which is governed by common law principles, "is a separate and distinct concept from the regulatory use of the term joint employment discussed in conjunction with Plaintiff's FMLA claims." *Grace v. USCAR*, No. 05-72847, 2006 WL 2850357, at *7 n.9 (E.D. Mich. Oct. 4, 2006).[1] The Sixth Circuit did not disagree with this portion of the district court opinion and also assumed, *arguendo*, that joint employment existed, holding that the defendants were entitled to summary judgment because the plaintiff could not establish pretext. *Id.* at 677-78. I thus find that *Grace* is not persuasive on the instant question regarding joint employment under the ADA.[2]

Defendant Magline does not expressly concede joint employment but argues that "[t]he joint employment relationship is not, in and of itself, 'reason to know'" or notice of disability. (Doc.

---

[1]The district court also aptly noted that, "although a number of federal district courts have considered the issue of whether common law joint employment concepts apply to cases involving temporary agencies under Title VII, the holdings are not uniform." *Id.*

[2]Had the *Grace* court discussed whether the defendant was an employer under Title VII, its analysis would have been pertinent to the instant ADA claim. *See Wathen v. General Electric Co.*, 115 F.3d 400, 404 n.6 (6th Cir. 1997) ("Because Title VII, the ADEA, and the ADA define 'employer' essentially the same way," we rely on case law developed under all three statutes).

30 at 2 (citing *Caldwell v. ServiceMaster Corp.*, 966 F. Supp. 33 (D.D.C. 1997)). The district court in *Caldwell* indicated that, "[t]o prevail on a theory of joint employer liability, a plaintiff must show that the defendant knew or should have known of the discriminatory conduct and that it failed to take those corrective measures within its control." *Id.* at 46. The district court in *Caldwell* thus concluded that since the plaintiff had not complained to the temporary agency about any discrimination by ServiceMaster, the plaintiff did not provide the temporary agency with sufficient notice of discrimination. *Id.*

In the instant case, Plaintiff attempts to impute knowledge of alleged disability in the opposite direction, i.e., from temporary agency, Kelly, to Magline. However, I suggest this directional difference is of little consequence. More troubling is the *Caldwell* court's reliance and citation to *Powell v. Las Vegas Hilton Corp.*, 841 F. Supp. 1024, 1029-30 (D. Nev. 1992), and *Magnuson v. Peak Tech. Services, Inc.*, 808 F. Supp. 500, 513 (E.D. Va. 1992). *Powell* considered whether the knowledge of a management-level employee could be imputed to his employer and *Magnuson* considered whether a waitress's employer could be charged with knowledge of sexual harassment of a non-employee customer who had a social relationship with the employer. Neither of these cases, however, involved a joint employment situation which I conclude undermines the *Caldwell* court's findings or at least causes reluctance to rely solely on it.

Therefore, rather than relying on the lack of evidence showing Magline had any particular notice from Kelly, I will assume joint employment is sufficient to impute the knowledge of one employer to the other and will examine the factors to be considered when determining whether joint employment is present.

Plaintiff contends that he is an employee of both Magline and Kelly because "Magline would routinely initiate termination of a temporary employee . . ., set all the rules and regulations

of work . . ., [gave or denied] permission for day off requests . . ., [and] exclusively supervised" Plaintiff as documented in the employment agreement. (Doc. 27 at 20.) Plaintiff cites the deposition testimony of Julie Trombley ("Trombley") in support of his argument. Trombley stated that "Kelly recommends an employee and says they can start on such and such a date. They show up and they start." (Trombley Dep., Doc. 27, Ex. 7 at 4.) She added that, "[i]f they don't work out, we call Kelly Services and say please end so and so's assignment." (*Id.*) Kelly would sometimes call or e-mail Magline and inquire how a temporary employee was doing. (*Id.* at 4-5.)

Trombley further testified that Magline does not provide temporary workers with any clothing, hats, ID badge or key, but that they do provide protective headgear whenever operating an overhead crane. (*Id.* at 6.) Trombley indicated that Magline supervisors or crew leaders supply the tools that temporary workers used. (*Id.* at 7.) Magline provided temporary and permanent employees with a time card that required approval from a Magline supervisor. (*Id.* at 8.) Plaintiff also proffers an Employee Confidentiality and Non-Competition Agreement, a Patent Assignment Agreement, and an Employee "Right to Know" Information document which Plaintiff signed prior to commencing his temporary employment with Magline. (Doc. 27, Ex. 13 at 1-6.) In addition, Plaintiff has submitted copies of two e-mails from Kelly Paige ("Paige") at Defendant Kelly to Trombley at Defendant Magline inquiring about Plaintiff taking days off. (Doc. 27, Ex. 15 at 2-3.) Trombley responded that Magline's "Plant Attendance Policy is a no-fault policy [such that] . . . the reason for anyone's absence within the plant doesn't really matter . . . [and] [a]lthough [Plaintiff] does not fall under this policy, I can't decide for John or anyone else whether it's o.k. for them to take the day off." (*Id.* at 2.)

Plaintiff's evidence, via Trombley's deposition testimony, shows that Magline had the authority to fire and discipline employees. If a temporary employee did not work out, Magline

12

could call Kelly and the employee would be terminated.  In addition, although the proffered e-mail

from Trombley indicates that Plaintiff did not "fall under" Magline's employee policy, it also

implies that Magline could discipline or withhold pay from Plaintiff and others for absences.

Furthermore, day-to-day supervision appears to have rested with Magline.  I therefore suggest that

Plaintiff has come forward with sufficient evidence to survive summary judgment on this limited

question of whether Kelly and Magline are joint employers such that the knowledge of one can be

imputed to the other.[3]

###    c.    Agency Theory

Under an agency theory, since the ADA does not define the term "agent," courts look to the

common law agency principles.  *Swallows*, 128 F.3d at 996 n.7 (finding no evidence that Barnes

and Noble acted as TTU's agent where "TTU did not delegate to Barnes & Noble the authority to

make employment decisions on its behalf, nor did it exercise the requisite control over Barnes &

Noble's employment decisions").  Courts "look to any express agreement between the parties as

to their status as it is the best evidence of their intent."  *Janette v. American Fidelity Group, Inc.*,

298 Fed. App'x 467, 471 (6th Cir. 2008).  The factors to be considered include the hiring party's

right to control the manner and means by which the product is accomplished, the skill required by

the hired party, the duration of the relationship between the parties, the hiring party's right to

assign additional projects, the hired party's discretion over work time and manner, the hired party's

---

[3]*See also Olynyk v. CRA Occupational Health, Inc.*, No. 3:04CV7249, 2005 WL 1459547, at *7 (N.D. Ohio June 21, 2005) (finding joint employment where plaintiff was an employee of independent contractor providing medical services to Daimler-Chrysler, where Daimler-Chrysler controlled plaintiff's day-to-day activities, set hours, set policies and procedures, reprimanded plaintiff when policy was violated, and had the ability to terminate plaintiff); *cf. Zinn v. McKune*, 143 F.3d 1353, 1357-58 (10th Cir. 1998) (granting summary judgment and discounting joint employment theory as applied to department of corrections where plaintiff worked as a nurse for independent contractor who provided medical services to the department, received compensation and benefits from medical care company, not the department, despite department's ability to exercise some supervisory control regarding inmate access to services and despite practice of department to "reimburse" medical care company for plaintiff's salary).

role in hiring, firing, and paying assistants, whether the work is in the scope of the hiring party's regularly conducted business, the hired party's employee benefits and tax treatment of the hired party's compensation, and the source of tools used to perform the work. *Id.* at 472. "While no one factor is dispositive, this Court has repeatedly held that the 'employer's ability to control job performance and the employment opportunities of the aggrieved individual' are the most important of the many factors to be considered." *Id.* (citations omitted).

At oral argument, Plaintiff's counsel clarified that its agency theory only goes one way, i.e., that Kelly was an agent of Magline. (*See also* Doc. 27 at 34 ("Kelly was Magline's agent for purposes of dealing with temporary employees").) Defendant Magline expressly argues that there is no agency relationship between Kelly and Magline. (Doc 30 at 3.) For the reasons stated earlier with regard to the joint employer theory, the only viable agency relationship would be Plaintiff as purported agent of Magline but there is no evidence that Kelly is an agent of Magline. There is, in addition, no evidence that Magline has any discretion over the manner in which Kelly conducts its business. I therefore suggest that this theory must fail.

## 2. ADA and PWDCRA

Assuming, *arguendo*, that Plaintiff was able to show that notice of disability was given, and that notice could be attributed to both Kelly and Magline under a joint employment theory, the substantive claims may be examined. Under the Michigan PWDCRA, claims may be analyzed in the same manner as those made under the ADA. *Collins v. Blue Cross Blue Shield of Mich.*, 228 Mich. App. 560, 568, 579 N.W.2d 435 (1998). The ADA provides:

> No covered entity shall discriminate against an individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The ADA prohibits an employer from "denying opportunities . . . to an otherwise qualified individual with a disability, if such denial is based on the need of [the employer] to make reasonable accommodation." 42 U.S.C. § 12112(b)(5)(B). A qualified individual is one "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

An employer discriminates against these otherwise qualified individuals when it does "not make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). "A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633-34 (6th Cir. 1998) (quoting *Monette*, 90 F.3d at 1183). The ADA regulations contemplate that once the employer has been made aware of the employee's request for an accommodation, the employer will "initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). "Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). "An employer, then, has the burden of persuasion to show that an accommodation would impose an undue hardship." *Id.*

Plaintiff may prove discrimination based on disability in two ways: with direct evidence of a defendant's discriminatory motive or with indirect evidence pursuant to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817,

36 L. Ed. 2d 668 (1973). *Kocsis v. Multi-Care Mgmt., Inc.* 97 F.3d 876, 882 (6th Cir. 1996) (ADA claims analyzed under established framework set forth in *McDonnell Douglas.*) Plaintiff has proffered both direct evidence and has also relied on the *McDonnell Douglas* framework for indirect evidence. Therefore, both will be considered.

### a. Direct Evidence

Plaintiff alleges that Kelly employee Paige's comment that, "[i]f Magline knew that I had any disability whatsoever, I would never have been allowed to walk in the front door," is direct evidence of discrimination by both Kelly and Magline. (Doc. 27 at 15, 34.) Counsel for Kelly contended at oral argument that the statement is not relevant because Kelly did let Plaintiff walk through the door, hired Plaintiff, and never terminated his employment. Magline countered that Kelly employees have no authority to speak for Magline. Plaintiff relies on the joint employer theory to attribute the Kelly employee's comment to Magline.[4]

"Direct evidence 'is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). If direct evidence is present, the burden then shifts to the defendant to show it would have taken the same actions regardless of discriminatory animus. (*Id.*) "[G]eneral, vague, or ambiguous comments do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008).

---

[4]Defendant Magline also argued that Paige's statement is inadmissible hearsay; however, since I suggest the statement does not provide direct evidence of discrimination, I need not reach the admissibility argument.

I suggest that, under Sixth Circuit precedent, Paige's comment is not direct evidence of discrimination. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524-25 (6th Cir. 2007) (evidence that vice president of sales commented that plaintiff was "too old" to handle an account was not direct evidence of age discrimination); *Rowan v. Lockheed Martin Energy Sys.,* 360 F.3d 544, 548-49 (6th Cir. 2004) (general comments by management about the need to lower the average age of the workforce was not direct evidence of discrimination). This conclusion is buttressed by the fact that the ADA requires discrimination based on disability to be the sole reason for the alleged adverse action. *See Hedrick v. Western Reserve Care System*, 355 F.3d 444, 454 (6th Cir. 2004) (interviewer's statement expressing concern whether plaintiff's medical condition would prohibit her form performing duties of job was not direct evidence because no evidence that interviewer's concerns were the sole reason not to hire her and there was no evidence of a series of comments or reports by employer that would show discriminatory intent).

I therefore will next consider whether Plaintiff can establish a prima facie case of discrimination based on disability.

**b.      Indirect Evidence**

**i.      Prima Facie Case**

To establish a prima facie case under the ADA, a plaintiff must show: (1) that he has a disability; (2) that he was otherwise qualified for his position; and (3) that the employer subjected him to discriminatory treatment solely by reason of his disability. *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996); *Hedrick v. Western Case System*, 335 F.3d 444, 454 (6th Cir. 2004) (noting that other circuits have held that an ADA plaintiff need show only that the disability was a motivating role rather than the sole reason for the adverse employment action but that *Monette* is still good law); *Macy v. Hopkins County School Bd. Of Educ.*, 484 F.3d 357,

364 n.4 (6th Cir. 2007) (noting that the Sixth Circuit appears to have erroneously adopted the "solely" standard from cases applying the Rehabilitation Act's express language prohibiting discrimination under federal grants and programs "solely by reason of his or her disability," 29 U.S.C. § 794(a), and also noting that the ADA bars discrimination "because of the disability" with no mention of the word "solely", but ultimately concluding that *Monette* is binding).

Under the ADA, a disability is defined as "either (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." *Moorer v. Baptist Mem'l Health Care Sys.,* 398 F.3d 469, 480 (6th Cir. 2005) (citing 42 U.S.C. § 12102(2)). "The regarded-as-disabled prong of the ADA 'protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities.'" *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (2008) (quoting *Gruener v. Ohio Casualty Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008)). The *Daugherty* court explained that

> [i]ndividuals may be regarded as disabled when '(1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities. In either case, it is necessary to show that the employer entertains misperceptions about the employee.

*Daughtery*, 544 F.3d at 704 (citations omitted).

Major life activities are generally everyday activities "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "[T]he ADA compares the performance of an individual who alleges a restriction in a major life activity to that of 'most people.'" *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 627 (6th Cir. 2000). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). A plaintiff

claiming an inability to work must show that her disability "significantly restrict[s] her ability to perform either a class of jobs or a broad range of jobs in various classes." *McKay v. Toyota Mfg., U.S.A., Inc.*, 110 F.3d 369, 373 (6th Cir. 1997). The corollary is also true, i.e., an impairment that prevents a person from performing only a narrow range of jobs is not considered a substantially limiting one. *Id.*

Plaintiff's alleged disability is dyslexia/dyscalculia and he has provided evidence of these impairments. (Doc. 27, Exs. 3, 6, 7.) However, "[m]erely having an impairment does not make one disabled for purposes of the ADA." *Toyota Mfg., Ky. v. Williams,* 534 U.S. 184, 195, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002). Plaintiff has not specifically alleged what major life activity is substantially limited by his impairment. I note that the only seemingly-relevant possibilities would be learning/reading and working.

As to the major life activity of working, Plaintiff contends that "testing was irrelevant to his work at Magline . . . [because] he could perform the actual work at Magline without accommodation." (Doc. 27 at 10.) I suggest that this constitutes an admission that Plaintiff does not in fact suffer from a disability that affects the major life activity of working. *See McKay*; *Daughtery*, 544 F.3d at 706 (no prima facie case under ADA where employer believed, at most, that plaintiff's condition precluded him from performing dangerous machinery functions required of the particular job but did not regard him as unable to perform a broad range of jobs in the field or other categories of employment).

Assuming, *arguendo*, that Plaintiff's reading impairments substantially limit a major life activity such as learning/reading, or that Plaintiff was regarded as having a disability, I suggest that Plaintiff cannot meet his burden of establishing a prima facie case. I note at the outset that Defendant Kelly accommodated Plaintiff's only request for accommodation, i.e., his request to

allow his wife to read the test questions to him, and Kelly never terminated or took any adverse action against Plaintiff. I therefore suggest that Plaintiff cannot establish a prima facie case against Kelly.

As to Defendant Magline, I suggest that Plaintiff cannot show he was "otherwise qualified for the position" because Plaintiff could not satisfactorily complete the work order analysis test that Magline required all temporary employees to pass (without assistance in the form of Plaintiff's wife actually answering the questions) nor could he successfully complete the test at the time he applied for the permanent position.

In the instant case, Plaintiff performed to the satisfaction of his supervisor Scott Dankert in the 22 stations[5] he worked; thus, Plaintiff argues that performance on the test is irrelevant. (Doc. 27 at 10.) Meeting the employer's expectations on the job does support the notion that the employee is "otherwise qualified" to perform the job. *Strickland v. Federal Express Corp.*, 45 Fed. App'x 421, 424 (6th Cir. 2002) (citing *Dews v. A.B. Dick. Co.*, 231 F.3d 1016, 1023 (6th Cir. 2000)). Defendant responds that Plaintiff's satisfactory performance in 20% of the work stations does not show that he was qualified to perform all of the jobs at Magline and that the tests are the best indicator of ability at all stations and adaptability to all types of jobs. (Doc. 27 at 10; Doc. 30, Ex. 3 ¶¶ 3, 9.) "[T]he ADA provides that employers are entitled to use 'qualification standards . . . that screen out or tend to screen out an individual with a disability,' provided that the standards are 'job-related for the position in question and are consistent with business necessity.'" *Broadway v. United Parcel Service, Inc.*, 499 F. Supp. 2d 992 (M.D. Tenn. 2007) (citations omitted).

Plaintiff has not alleged or offered any evidentiary support to show that the test standards were not job-related or that they were inconsistent with business necessity. Therefore, I suggest

---

[5]During oral argument, counsel for Magline stated that there were 110 work stations in the plant.

that Plaintiff cannot show that he was otherwise qualified where he was unable to pass the requisite employment assessment tests. *See Danczak v. Ford Motor Co.*, 215 Fed. App'x 442, 444-45 (6th Cir. 2007) ("[c]ommon sense, to say nothing of Ford's business judgment, supports the point" that production quotas legitimately test an essential function of assembly line work); *Tolley v. TVA Bd. of Directors*, No. 3:08-cv-0075, 2009 WL 151569, at *8 (M.D. Tenn. Jan, 21, 2009) (inability to successfully complete written and computer-based tests in training program showed plaintiff was not otherwise qualified under Rehabilitation Act).

Even assuming, *arguendo*, that Plaintiff was otherwise qualified for the position, I suggest that Plaintiff cannot show that the employer subjected him to discriminatory treatment solely by reason of his disability. Plaintiff contends that he was subject to two discriminatory actions: (1) being terminated from his temporary position with Magline; and (2) not being hired for the permanent position at Magline. (Doc. 27 at 17.) As to the temporary position, Magline has presented evidence that it was following its policy to terminate temporary employees before they reach the 1,000-hour mark. As to the permanent position, Magline has presented evidence that it was acting according to its policy requiring employees to pass an eligibility test. Plaintiff has not come forward with any evidence that Magline's policies were not applied to others who lack disabilities and thus, has not shown that he was subject to discriminatory treatment solely on the basis of disability. As to Kelly, Kelly never terminated or otherwise took any adverse action against Plaintiff and thus did not subject Plaintiff to any discriminatory treatment. I therefore suggest that Plaintiff has failed to establish a prima facie case.

### ii. Legitimate Nondiscriminatory Reason

Even if Plaintiff could establish a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse actions. *Macy*, 484 F.3d at 364.

As to the temporary position, Plaintiff contends that he could have worked approximately two more weeks for Magline before he reached the 1,000-hour limit and the fact that Magline did not allow him to do so is evidence of Magline's pretext. (Doc. 27 at 17.) On the other hand, Magline indicated that its practice is to terminate temporary assignments with a "cushion of time remaining before the 1,000 hour maximum is met." (Trombley Aff., Doc. 30, Ex. 2 ¶ 5.) Magline indicated that seven people, including Plaintiff, who tested for the permanent position in February 2006 had been terminated from their temporary employment at 755, 829, 871, 922, 930, 948, and 964 hours, placing Plaintiff at the median number of hours. (*Id.* ¶ 8.) As to the permanent position, Magline contends that it did not hire Plaintiff because Plaintiff was unable to successfully complete the test administered to permanent position candidates. (Doc. 23 at 7.)

I suggest that even if Plaintiff were able to establish a prima facie case, Magline has come forward with legitimate, nondiscriminatory reasons for its action, e.g., its policies to terminate temporary employees before they reach 1,000 hours and to require employees to pass an assessment test before being hired for a permanent position.

### iii. Pretext

If defendant proffers a legitimate, nondiscriminatory reason for the adverse action taken, the plaintiff must then "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Macy,* 484 F.3d at 364. The Sixth Circuit "has repeatedly stated that an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of the disability, if that conduct disqualifies the employee from his or her job." *Id.* at 366.

"In challenging an employer's action, an employee 'must demonstrate that the employer's reasons (each of them, if the reasons independently cause [the] employer to take the action it did)

are not true.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (quoting *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 676 (7th Cir. 1997)). This is inherent in the Sixth Circuit's requirement that an ADA plaintiff establish that the adverse employment action occurred "solely by reason of his handicap." *Monette, supra.*

Pretext is established by showing that the proffered legitimate, nondiscriminatory reason: (1) has no basis in fact; (2) did not actually motivate the employer's action; or (3) was insufficient to motivate the action. *Macy,* 484 F.3d at 367. In order to show that there was no basis in fact for the decision made, "a Plaintiff must put forth 'evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are factually false.'" *Abdulnour v. Campbell Soup Supply Co. LLC*, 502 F.3d 496, 502-03 (6th Cir. 2007) (citations omitted) (granting summary judgment where "Plaintiff fail[ed] to provide evidence that these complaints were false, inaccurate, or not made"). In order to show that a defendant's proffered reason did not actually motivate defendant's challenged conduct, a "[p]laintiff must show 'that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext or coverup.'" *Id.* at 503 (citations omitted). "The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979) (quoted with approval in *White v. Baxter Healthcare*, 533 F.3d 381, 394 (6th Cir. 2008)).

"Pretext, however, cannot be shown by attacking the decision itself." *Hein v. All American Plywood Co., Inc.*, 232 F.3d 482, 490 (6th Cir. 2000). "A court 'may not reject an employer's explanation [of its action] unless there is sufficient basis *in the evidence* for doing so.'" *Brennan v. Tractor Supply Company*, 237 Fed. App'x 9, 20 (6th Cir. 2007) (emphasis in original) (quoting

*Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 600 (6th Cir. 2001)). "Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Simms v. Okla. ex re. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir. 1999) (quoted with approval in *Conner v. State Farm Mutual Auto Ins. Co.*, 273 Fed. App'x 438, 443-44 (6th Cir. 2008)).

Plaintiff has not come forward with any evidence tending to show that Magline's reasons did not "actually motivate" it. Nor has Plaintiff proffered any evidence to show that discrimination makes it "more likely than not" that Magline's explanation is a pretext. *Id.* at 503. Nor has Plaintiff shown how Magline's decisions were so "idiosyncratic" or "questionable" that only pretext, based on disability, could explain otherwise obtuse decisions. *Loeb*, 600 F.2d at 1012.

I therefore suggest that, even if Plaintiff could establish a prima facie case, there is no evidence tending to show that Magline's proffered reasons were a pretext for discrimination, and therefore Defendants' motions for summary judgment should be granted.

### F.	Conclusion

For all the reasons stated above, I suggest that Defendants' motions for summary judgment be granted in their entirety and that the case be dismissed with prejudice.


## III.	REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are

advised that making some objections, but failing to raise others, will not preserve all the objections

a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Social Security*,

474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich.

LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.


                                        s/ Charles E Binder
                                        CHARLES E. BINDER
Dated: March 24, 2009                   United States Magistrate Judge




                              **CERTIFICATION**

      I hereby certify that this Report and Recommendation was electronically filed this date,
electronically served upon counsel of record via the Court's ECF System, and was served on U.S.
District Judge Ludington in the traditional manner.


Date:  March 24, 2009              By     s/Patricia T. Morris
                                          Law Clerk to Magistrate Judge Binder